Filed 9/15/16  P. v. Castro CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL ANGEL CASTRO,<br><br>    Defendant and Appellant. | B264800<br><br>(Los Angeles County<br>Super. Ct. No. YA090888) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan B. Honeycutt, Judge.  Affirmed.

Law Offices of James Koester and James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Miguel Angel Castro, appeals his conviction of grand theft of a firearm, making a criminal threat, and exhibiting a firearm, with a firearm use enhancement. (Pen. Code, §§ 487, subd. (d)(2), 422, subd. (a), 417, subd. (a)(2)(b); 12022.5.)[1] He was sentenced to six years in state prison.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution Evidence*.

    a. *The theft of the gun*.

In 2014, Matthew Brown was living in a two-bedroom residence in Lawndale with his fiancé and her mother, Olga Revilla. Brown and his fiancé occupied one bedroom and Revilla occupied the other. At the time, Brown owned a semi-automatic handgun which he kept on his nightstand next to a loaded magazine. There were bullets in the magazine, but the magazine was not loaded into the gun.

On June 25, 2014, Revilla made a report to the Sheriff's Department that Brown's gun had been stolen. Deputy Sheriff Matt Bengston spoke to Brown, who was in San Diego, about the gun by telephone. Brown said he had not given Castro or any other individual permission to take his gun.

    b. *The confrontation between Castro and Patricia over the gun*.

In August 2014, Castro was 22 years old and living in a house in Lawndale with his mother and his sister, Yanet. On August 3, 2014, Castro's mother was out of town and his oldest sister, Patricia, was visiting the house with her husband, Rafeal, and their children. Patricia, who testified by means of a Spanish language interpreter, said that on the evening of August 3, Castro was not home when she and Rafeal found a gun inside a box atop a cabinet in her mother's bedroom. Rafeal wrapped the gun in a yellow rag and hid it outside the house in a flower pot.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

The next morning, Patricia and Rafeal went out with their children for milkshakes at a shop next to a restaurant called El Pollo Inka. The shop is located about three minutes driving distance from the house. While at the shop, Patricia received a call from Castro asking where "it" was; she knew that he was asking about the gun's whereabouts. Patricia testified: "I felt worried because . . . my mother wasn't there that day. My mother left me in care of her house. And more than anything, she asked me to look over [Castro]." After she got off the phone, Rafeal told her that he had hidden the gun in a flower pot in front of her mother's house.

Patricia gave inconsistent accounts of what happened next. Deputy Sheriff Nancy Veliz testified that Patricia told her that Castro "was very upset and . . . aggressive on the phone."[2] In an attempt to calm the situation, Patricia and Rafeal went back to the house to give Castro the gun. After they gave him the gun, Castro was still very upset: "He kept cursing and arguing with her," and at some point, "He racked the gun as appearing like he was going to use it against her, and he made a statement to her that he was going to shoot her." Veliz could not recall the specific Spanish word Patricia had used when she described Castro racking the gun. Patricia said she and Rafeal left the house and called 9-1-1.

Deputy Dennis Woullard testified that Patricia told him (with the help of Deputy Veliz[3]) that the day before the incident, she and her family were afraid for their lives because Castro was walking around with a gun in the house and Patricia did not want Castro to have the gun because of his erratic behavior. So Rafeal took the gun and hid it in the flowerpot outside the house. When Castro called Patricia the next morning to ask where the gun was, he sounded very angry on the phone so Patricia went home and gave the gun back to him to prevent him from getting angrier. Nevertheless, Castro remained

---

[2]    Deputy Veliz testified that she and Patricia conversed in Spanish.

[3]    Because Deputy Woullard did not speak Spanish, Deputy Veliz acted as a translator while Deputy Woullard interviewed Patricia. Deputy Veliz was certified by the Sheriff's Department as a Spanish speaker and had previously translated for Deputy Woullard about ten times.

angry and was still yelling and cursing even after she returned the gun. Patricia told Woullard that Castro then "pulled it from his [waistband] and racked a round, which really means he's taken a round from the magazine and putting it in the chamber." Patricia said that as Castro was racking the gun he said he would shoot her. Woullard asked Patricia if she was scared when Castro did this, and she said yes.[4]

Patricia's trial testimony was inconsistent with her statements to Deputies Veliz and Woullard. Patricia testified at trial that following her telephone conversation with Castro, she then drove back alone to her mother's house to speak to him. When she arrived, Castro was lying down in the living room and his demeanor was "normal." Patricia asked Castro who the gun belonged to and he replied, "I'm going to return it, Patty. It's not mine." (RT 424) Patricia said she would give the gun back to him, but that if he did not return it she would call the police. After Patricia told Castro where Rafeal had hidden the gun, Castro retrieved it and said, "I'm going to take it back, Patty." Patricia testified that she was mad and she "told him off," at which point Castro got upset. Castro took the gun (still wrapped in the rag) into the bathroom, while Patricia went into her mother's bedroom. Patricia testified that was the last time she saw the gun. She also testified that, as she was leaving the house, she told Castro that she was going to call the police anyway because she was angry about Castro keeping a gun in her mother's house.

Rafeal also gave varying accounts of the confrontation with Castro. Accordingly to Deputy Woullard, Rafeal told him at the scene that he had gone back to the house with Patricia to return the gun, an argument had ensued, and Castro racked a round and said he would shoot Patricia. When the prosecutor asked Woullard if he believed Rafeal had been present when Castro racked the gun, Woullard responded that "[b]y all indications" Rafeal had been present. In his own trial testimony, however, Rafeal denied having gone back to the house with Patricia.

---

**4** When the prosecutor asked Woullard if Patricia had make any hand movements to indicate where the gun was when the defendant racked a round, Woullard stated: "He had it pointed down at the ground, but she was close, within, like, two feet of him."

4

c. *The 9-1-1 Call.*

Patricia testified that after her confrontation with Castro about the gun, she left the house, got into her car, and called Yanet. Patricia told Yanet there was a weapon in the house and asked her to meet her at El Pollo Inka. Yanet met Patricia in the parking lot of El Pollo Inka less than five minutes after Patricia arrived. They had a brief conversation about what had occurred and Patricia then asked Yanet to call 9-1-1.

Yanet called 9-1-1 with Patricia present. Yanet relayed to the 9-1-1 operator what Patricia was telling her to say. The 9-1-1 call was played for the jury, and it included the following exchanges:

"[Dispatcher]: Hello? Do you have any emergency?

"[Yanet]: Yeah, um, my brother he has a gun and . . . I don't think it's safe like for us to be here [*sic*] in the house[.]

"[Dispatcher]: What is he doing with the gun?

"[Yanet]: Um, I just got home right now but *my sister she said that he was about to pull the trigger on her.*" (Italics added.)

A little later during the 9-1-1 call, there was this exchange:

"[Dispatcher]: Where is he now?

"[Yanet]: Right now he's at home . . . he's not letting anyone in and --

"[Dispatcher]: Who's in the house with him?

"[Yanet]: *Speaking in Spanish** No one . . . he's alone in there[.]

"[Dispatcher]: He locked himself inside the home?

"[Yanet]: Yeah. But *he said that if we go back there he's gonna pull the trigger on – to my sister*[.] [¶] . . . [¶]

"[Dispatcher]: *Is he gonna shoot them or shoot himself?*

"[Yanet]: Shoot – *Shoot my sister.*" (Italics added.)

After hearing the 9-1-1 tape played in court, Yanet testified that the reason she told the operator that Castro was about to pull the trigger on Patricia was "[b]ecause I thought that's what [Patricia] said." Yanet also testified that during the time she was placing the 9-1-1 calls, Patricia did not seem scared, but rather was angry. Patricia

5

testified she told Yanet to call 9-1-1 because she (Patricia) was angry and she wanted the police to take the gun away from Castro.

d. *Castro's detention and the investigation*.

Shortly after the 9-1-1 call, Patricia heard sirens and saw police vehicles headed toward her mother's house. The police then called Yanet and said, "You have to come to the house." Yanet, Patricia, Rafeal, and the children then drove back to the house.

Deputy Woullard's unit was one minute away from Castro's house when 9-1-1 dispatch requested a unit to respond to an emergency there. Woullard arrived at the house with nine to twelve deputies. The deputies were just detaining Castro when Patricia arrived. After Castro was detained,[5] Woullard interviewed Patricia, who had already spoken to Deputy Veliz.

Patricia testified that she did not tell Deputy Veliz that Castro had threatened her with a gun. According to Patricia, Deputy Veliz did not speak Spanish well and so the deputy called Yanet over to translate. Patricia testified she told Yanet that the deputy "was getting confused because [the deputy said to Patricia], Ma'am, you have to say that he is pointing it at you. And I told her that he didn't point it at me. We only called because there was a weapon in the house, and that's what I told my sister to tell her."

Deputy Veliz testified that her parents were from Guatemala and that she herself had grown up speaking Spanish. She had been certified as a Spanish language speaker by the Sheriff's Department for the entire ten and a half years she had worked there. She used Spanish in the field or in an official capacity "Constantly. Everyday." Veliz testified that she had no trouble communicating with Patricia during this interview, and that Patricia never said she could not understand what Veliz was saying. Veliz testified she did not use any of Castro's family members to translate because there was no need. This was corroborated by Yanet, who testified that after the family left the restaurant and returned to the house after calling 9-1-1, she saw Patricia speaking alone to a female

---

[5]     Woullard testified that Castro came out of the house; the police did not enter the house to detain him.

officer. Yanet testified she could not hear their conversation: "She was talking to her in Spanish so . . . I didn't have to translate it to her."

After Castro was taken into custody, Yanet gave the officers permission to search the house. Woullard testified he found a .40-caliber semi-automatic handgun in a closet. The gun turned out to have the same serial number as the gun stolen from Michael Brown. When Woullard found it, the gun was operable: it had a bullet in the chamber, and a magazine in its handle.

Los Angeles County Sheriff's Detective Armando Cuevas testified he had been assigned to investigate the theft of Brown's gun and, on August 4, 2014, when he heard a police broadcast giving Castro's address, he recognized it as relating to his investigation. Cuevas also testified that he heard Rafeal testify at the preliminary hearing that Patricia had been frightened after the incident with Castro. Cuevas interviewed Castro on August 5 at the police station. Castro admitted to Cuevas that he had gotten angry when he learned that Patricia and her husband had hidden the gun. Castro said he took bullets and the magazine out of the gun. He denied having pointed the gun at Patricia.

The parties stipulated that on September 17, 2014, Patricia spoke in Spanish to Defense Investigator Hernandez, who was from the Public Defender's Office. The stipulation recited that Hernandez would have testified that Patricia told him *both* that (1) Castro did not "rack the gun," "point the gun at her," or "threaten her with the gun," *and* (2) Castro "cursed at her" and "said something like, I could kill you, but she did not take it as a threat because they are siblings and they have argued like this before. [Castro] was just talking crazy because he was mad." At trial, Patricia denied telling the investigator that her brother had said something along the lines of "I could kill you."

2. *Defense Evidence*.

Castro testified that he had been acquainted with Revilla and on June 24 she invited him inside her house. They drank some whiskey and had sex on the living room couch. Afterward, they decided to move to Revilla's bedroom as Castro was planning to spend the night, but being unfamiliar with the house he got confused and walked into Revilla's daughter's bedroom, where he spotted the gun. Castro was interested in the gun

7

because in the past he had been shot and stabbed, so he asked Revilla if he could borrow the gun. When Castro picked up the gun, she told him to put it back, which he did. After they talked some more, Castro grabbed the gun and ran home with it. He intended to return it, but he lost Revilla's phone number. Castro testified he was intoxicated when he took the gun. Castro testified that his plan had been to return the gun after having taken it on June 24, 2014. He was waiting for Revilla to come pick it up and, meanwhile, he was keeping it in a box along with other personal things on a shelf in his mother's room.

Regarding the incident of August 4, 2014, Castro testified that when he woke that morning, he did not initially notice that the gun was missing. He called Patricia just to ask where she was and to check if everything was all right, but then he noticed that the gun was missing, so he asked Patricia if she knew anything about it. Patricia said she was going to come back to the house to talk to him.

After the phone call, Castro fell asleep and woke to find Patricia had returned to the house. She was mad about the gun. They also discussed a potential job for Castro at a bakery. Castro became upset when Patricia mentioned that he needed to get a job that paid well so he could help out with household expenses. At the end of their conversation, Patricia told Castro that the gun was in the flowerpot. He retrieved the gun and took it into the bathroom to see if it was loaded because he was concerned that it might be dangerous because there were children staying at the house. He testified: "I checked if the gun had a bullet in it. . . . I pulled the chamber back and it made that noise, the metal-with-metal noise." "Q. And when you unwrapped it, was the magazine in the gun or was the magazine separate? [¶] A. It was in the gun." Castro testified he "took the magazine out and then . . . checked if the gun had a bullet," after which he "put [the magazine] to the side. I put it to the side of the box." He then left the bathroom and placed the gun and magazine separately on a shelf at the top of a high closet. Patricia, who was still angry, said that she would call the police if he did not return the gun. Castro said he had to tell his friend to come pick it up. He denied threatening to hurt Patricia or having any reason to threaten her.

8

3. *Trial outcome.*

The jury found Castro guilty on count 2 of grand theft of a firearm (§ 487, subd. (d)(2)); on count 3 of criminal threats (§ 422, subd. (a)); and, on count 4 of exhibiting a firearm (§ 417, subd. (a)(2)(B)). The jurors also found true the enhancement allegation that Castro had personally used a firearm in the commission of the criminal threats offense (§ 12022.5). Castro was sentenced to a total prison term of six years.

## CONTENTIONS

Castro contends: (1) the trial court erred by failing to instruct the jury on the lesser included offense of attempted criminal threat; (2) CALCRIM No. 3146 failed to sufficiently instruct the jury on the "facilitative nexus" element of the firearm use enhancement; (3) the trial court erred by failing to instruct the jury on the lesser included enhancement of having been armed with a firearm; (4) there was prosecutorial misconduct during closing argument; and (5) this court should independently review the sealed *Pitchess* file.

## DISCUSSION

1. *Failure to instruct jury on lesser included offense of attempted criminal threat was harmless error.*

Castro contends the trial court erred by failing to instruct the jury, sua sponte, on attempted criminal threat as a lesser included offense of the charged criminal threat. We agree the trial court committed instructional error, but conclude the error was harmless.

a. *Legal Principles.*

"When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so." (*People v. Webster* (1991) 54 Cal.3d 411, 443.)

"An offense is necessarily included within a charged offense 'if under the statutory definition of the charged offense it cannot be committed without committing the lesser offense, or if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is

9

necessarily committed.' [Citation.]" (*People v. Toro* (1989) 47 Cal.3d 966, 972, disapproved on other grounds by *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.) "[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.] [¶] In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Ibid.*)

"[O]n appeal we employ a de novo standard of review and independently determine whether an instruction on the lesser included offense . . . should have been given." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) "[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)]. A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*Breverman, supra,* 19 Cal.4th at p. 178, fn. omitted.)

Section 422, subdivision (a), provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her

own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

In *People v. Toledo* (2001) 26 Cal.4th 221 (*Toledo*), our Supreme Court said: "In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*Id*. at pp. 227-228.)

*Toledo* pointed out there were situations in which a defendant would have committed no more than the lesser included offense of *attempting* to make a criminal threat if either element (4) or element (5) had not been proved. "A variety of potential circumstances fall within the reach of the offense of attempted criminal threat. For example . . . . if a defendant . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Toledo*, *supra*, 26 Cal.4th at p. 231.)

  b. *Discussion*.

Castro argues "there was . . . substantial evidence that Patricia did not subjectively suffer sustained fear when she specifically testified that she was not afraid appellant would shoot or otherwise harm her." We agree there was substantial evidence that

Patricia was never in sustained fear as a result of her encounter with Castro about the gun. There was evidence that Patricia believed her younger brother would never harm her, that they had argued like this before, and that she believed whatever he said to her was not a real threat. Thus, we agree with Castro that the trial court had a sua sponte obligation to instruct on attempted criminal threat as a lesser included offense. However, the trial court's failure to do so was harmless error.

Under the standard of *Watson*, "[r]eversal is required only if it is reasonably probable the jury would have returned a different verdict absent the error or errors complained of. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 867-868, fn. omitted.) "In determining whether a failure to instruct on a lesser included offense was prejudicial, an appellate court may consider 'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations.]" (*Id.* at p. 870.) That is precisely the situation here because it is quite clear the jury thoroughly rejected the witnesses' testimony that was favorable to Castro.

Castro testified he never threatened Patricia with the gun. Patricia's testimony coincided with Castro's testimony. That is, Patricia testified that Castro never threatened her – *not* that Castro threatened her but she was unafraid. However, this defense story was thoroughly contradicted by the trial evidence at every turn. On at least three separate occasions in the immediate aftermath of Patricia's confrontation with Castro at the house, she told someone that Castro had just threatened to shoot her. Immediately after leaving the house, Patricia had Yanet call 9-1-1 and tell the operator that Castro had just threatened to shoot her. Within minutes of that call, Patricia told two different deputy sheriffs in separate conversations that Castro had threatened to shoot her. Patricia's attempt to discredit the officers' testimony, by claiming that Deputy Veliz did not speak Spanish well, was entirely upended when her sister Yanet testified – in direct contradiction to Patricia's testimony – that she (Yanet) did *not* act as an interpreter while Patricia was speaking to Veliz. By convicting Castro of having made a criminal threat,

12

the jury demonstrated that it believed Patricia's contemporaneous account of the relevant events – *not* the contradictory account she gave at trial.

In addition, the evidence further demonstrated that Patricia had indeed been frightened by Castro's criminal threat. Trial evidence showed that Patricia's husband testified at the preliminary hearing that Patricia had been frightened by the incident with Castro. Moreover the jury found that Castro personally used a firearm during the crime (§ 12022.5) – which at a minimum meant that he displayed the weapon in a menacing manner. Castro was also found guilty of brandishing a firearm, which meant that he had drawn or exhibited a firearm in the presence of another person in a rude, angry, or threatening manner. (§ 417, subd. (a)(2)(B).)

Thus, there was no reasonable probability that if the jury had been instructed on attempted criminal threat it would have convicted Castro of that lesser offense rather than the greater offense of making a criminal threat.

2. *The trial court did not misinstruct the jury on the elements of the gun use enhancement.*

Section 12022.5, subdivision (a), provides that "any person who personally uses a firearm *in the commission of* a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense." (Italics added.) Castro contends that CALCRIM No. 3146, the standard firearm use instruction, inadequately explained the "facilitative nexus" element required by section 12022.5. We disagree.

Castro's jury was instructed: "If you find the defendant guilty of the crime charged in Count 3 [i.e., having made a criminal threat in violation of section 422] you must then decide whether the People have proved the additional allegation that the defendant personally used a firearm *during the commission* or attempted commission of that crime." (Italics added.) The instruction then went on to say: "Someone personally uses a firearm if he intentionally does any of the following: [¶] 1. Displays the weapon in a menacing matter; [¶] 2. Hits someone with the weapon; [¶] [or] [¶] 3. [Fires] the weapon."

13

Castro claims the instruction's use of the phrase "*during* the commission of" instead of "*in* the commission of" constituted prejudicial error. We disagree, because we conclude that, taken as a whole, CALCRIM No. 3146 adequately addressed the necessary facilitative nexus between the underlying offense and the firearm use allegation.

Under California law, a firearm enhancement requires a "facilitative nexus" between the enhancement and the underlying offense. For enhancement purposes, "a defendant is [for example] armed if the gun has a facilitative nexus with the underlying offense (i.e., it *serves* some purpose in connection with it)." (*People v. Brimmer* (2104) 230 Cal.App.4th 782, 794-795.) This concept of "facilitative nexus" was explained, in the context of an arming enhancement allegation, by *People v. Bland* (1995) 10 Cal.4th 991, 1002: "[F]or a defendant to be subject to additional punishment for being armed with a firearm, California law requires the 'arming' to be 'in the commission or attempted commission' of the underlying felony. (§ 12022, subd. (a)(1).) With respect to felony drug possession [for instance], a defendant is armed 'in the commission' of that crime so long as the defendant had the firearm available for use in furtherance of the drug offense at some point during the defendant's possession of the drugs. Thus, by specifying that the added penalty applies only if the defendant is armed with a firearm 'in the commission' of the felony offense, section 12022 implicitly requires both that the 'arming' take place *during* the underlying crime and that it have some '*facilitative nexus*' to that offense. Evidence that a firearm is kept in close proximity to illegal drugs satisfies this 'facilitative nexus' requirement: a firearm's presence near a drug cache gives rise to the inference that the person in possession of the drugs kept the weapon close at hand for 'ready access' to aid in the drug offense."

"Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies." (*People v. Chambers* (1972) 7 Cal.3d 666, 672.) Obviously, the display of a firearm, when directly coupled with a threat to use the firearm, may constitute "use." (See, e.g., *People v. Dominguez* (1995) 38 Cal.App.4th

14

410, 421 [defendant found guilty of carjacking with firearm use enhancement for holding barrel of gun against victim's neck, coupled with threats to kill].).  However, firearm use need not "be strictly contemporaneous with the base felony.  'In considering whether a gun use occurred, the jury may consider a "video" of the entire encounter; it is not limited to a "snapshot" of the moments immediately preceding [the underlying] offense.  Thus, a jury could reasonably conclude that although defendant's presence with the victims was sporadic, the control and fear created by his initial firearm display continued throughout the encounter.'  [Citation.]  Accordingly, defendant's jury was [properly] instructed that '[a] gun need not be continually displayed during the course of a crime in order for it to be personally used within the meaning of Penal Code section 12022.5, [s]ubdivision (a).' " (*People v. Wilson* (2008) 44 Cal.4th 758, 807.)

Castro argues that CALCRIM No. 3146's use of the phrase "during the commission of the offense" would have led a reasonable juror to believe that the enhancement allegation "merely required a temporal relationship between the appellant's possession or use of the firearm and the criminal threat."  We do not agree.  As we have said, CALCRIM No. 3146 instructs that "Someone personally uses a firearm if he intentionally does any of the following:  [¶]  1. Displays the weapon in a menacing manner;  [¶]  2. Hits someone with the weapon;  [¶]  [or]  [¶]  3. [Fires] the weapon."  This clarifying language adequately advised the jury of the need to find a "facilitative nexus" between the enhancement and the underlying offense because each of the instruction's examples is "facilitative" in nature.  Accordingly the trial court did not misinstruct the jury on the elements of the gun use enhancement.

Moreover, even were the instructions erroneous, any error was not prejudicial.  The jury – under instructions that Castro makes no claim were incorrect – found true the first three elements of the criminal threat charge, i.e., that Castro " 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' [and that he] . . . made the threat 'with the specific intent that the statement . . . is to be taken as a threat' [and] . . . that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and

15

specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat.' " (*Toledo*, *supra*, 26 Cal.4th at pp. 227-228.)  These jury findings are altogether at odds with the notion that Castro was only handling the firearm by happenstance (and then taking it into the bathroom to unload it) rather than using it to facilitate the underlying offense of making a criminal threat.[6]

Because the instructions could not have led the jury to believe it did not have to find that Castro's handling of the gun played some integral part in his uttered threat to harm Patricia, there was no prejudicial error.

3.  *The trial court did not have a sua sponte duty to instruct on being armed with a firearm as a lesser included enhancement to the firearm-use enhancement.*

Castro contends the trial court should have instructed the jury, sua sponte, on a lesser included "armed with a firearm" enhancement in addition to the use of a firearm enhancement. We disagree.

In *People v. Majors* (1998) 18 Cal.4th 385, the California Supreme Court, while specifically discussing firearm enhancements, held that a trial court does not have a sua sponte obligation to instruct the jury on lesser included enhancements.  As *Majors* explained:  "One of the primary reasons for requiring instructions on lesser included offenses is ' "to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between [guilt] and innocence" ' – that is, to eliminate ' "the risk that the jury will convict . . . simply to avoid setting the defendant free." ' [Citation.]  This risk is wholly absent with respect to enhancements, which a jury does not even consider unless it has already convicted defendant of the underlying substantive offenses.  [Citation.]  Under these circumstances, we hold that a trial court's sua sponte obligation to instruct on lesser included offenses does not encompass an obligation to instruct on 'lesser included enhancements.' " (*Id*. at pp. 410-411.)

---

[6]     Moreover, Castro was also convicted of brandishing a firearm (count 4, § 417, subd. (a)(2)(B)) arising out of this same incident, which meant the jury had to find that he "drew or exhibited a firearm in the presence of someone else" and "did so in a rude, angry, or threatening manner."

Castro argues that subsequent rulings in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348] (*Apprendi*), *Alleyne v. United States* (2013) 133 S.Ct. 2151 [186 L.Ed.2d 314] (*Alleyne*), and *People v. Seel* (2004) 34 Cal.4th 535 (*Seel*), should lead this court to reconsider *Majors*.[7]  He asserts that "the [rationale] underlying the court's holding in *Majors* appears to be no longer viable and is ripe for reconsideration."

We disagree that *Majors* is inconsistent with *Apprendi*, *Alleyne*, and *Seel*.  In *Apprendi*, the United States Supreme Court determined that a criminal defendant's right to a jury trial extends to sentencing enhancements, which the court concluded are "the functional equivalent of an element of a greater offense."  (*Apprendi*, *supra*, 530 U.S. at pp. 490, 494.)  In *Alleyne*, the court applied the same reasoning to facts that increase mandatory minimum sentences, holding that there is a right to have such facts found by a jury.  (*See Alleyne*, *supra*, 133 S.Ct. at p. 2155.)  In *Seel*, the California Supreme Court held that a premeditation allegation is an element of the greater offense of premeditated attempted murder for double jeopardy purposes.  (*See Seel*, *supra*, 34 Cal.4th at p. 541.[8]

Castro's argument that *Majors* is inconsistent with *Apprendi*, *Alleyne*, and *Seel* is misguided.  *Apprendi* and *Alleyne* dealt with protecting a defendant's Sixth Amendment right to have the jury determine any fact that may lead to a greater prison term or a greater minimum prison term.  In *Seel*, our Supreme Court merely determined that, in light of *Apprendi*, Fifth Amendment double jeopardy protections preclude the retrial of

---

[7]     Castro properly points out that "inferior courts may consider questions of first impression, including the effect that subsequent [United States] Supreme Court decisions have upon decisions from the California Supreme Court."  As *People v. Johnson* (2012) 53 Cal.4th 519, 528, explained:  "Lower courts may decide questions of first impression, including the effect that subsequent events, such as a United States Supreme Court decision, have on decisions from a higher court, including this one. . . .  [A] lower court does not violate *Auto Equity* [*Sales, Inc. v. Superior Court* (1962)] 57 Cal.2d 450, merely by deciding questions of first impression."

[8]     *Seel* concluded that "[b]ecause the premeditation allegation (§ 664(a)) effectively placed defendant in jeopardy for an 'offense' greater than attempted murder [citations], the Court of Appeal's finding of evidentiary insufficiency bars retrial of the allegation under the federal double jeopardy clause.  [Citation.]"  (*Seel*, *supra*, 34 Cal.4th at p. 541.)

17

premeditation allegations after a finding of evidentiary insufficiency. Castro fails to persuasively explain how these cases undermine *Majors*'s holding that trial courts have no obligation to instruct sua sponte on lesser included *enhancements*. *Apprendi*, *Alleyne* and *Seel* simply did not address the question of whether a trial court has a sua sponte duty to give a lesser included offense instruction as to a firearm enhancement. Nor does *Majors* affect the right to have a jury act as the factfinder where penalty increases or increases in minimum sentences are possible. Castro himself had the benefit of a jury finding on the firearm use enhancement allegation.

The trial court here did not err by failing, sua sponte, to instruct on arming (§ 12022) as a lesser included enhancement.

4. *There was no prejudicial prosecutorial misconduct.*

Castro contends his convictions must be reversed because, during closing argument, the prosecutor committed reversible misconduct by implying that defense counsel had coached Castro on his testimony. We disagree.

a. *Relevant proceedings.*

During closing argument, the prosecutor told the jury: "Let's talk briefly about the defendant's testimony. He's the only witness who has an opportunity to sit in court and listen to everyone's testimony before he has an opportunity to testify. So he gets to cater his testimony to make sure that it fits in with the facts of the case. [¶] His account – interestingly, his account of the facts negates one of the elements of burglary. How convenient. He's clearly been coached on the testimony."

Defense counsel immediately asked to approach the bench and requested a mistrial based on the prosecutor's implication that defense counsel had coached Castro on his testimony. The trial court agreed it was troubling that the prosecutor had suggested defense counsel "coached his client to testify in a particular manner to negate certain elements of each[9] of the charged crimes." The following colloquy then occurred:

---

[9] The court misspoke because the prosecutor's comment addressed only one of the charged crimes.

18

"[The prosecutor]: . . . [H]e has had the opportunity to sit here throughout the trial. I did say he's been coached. I never raised [defense counsel's] name as the person.

"The court: Who else would he be coached by?" [¶] . . . [¶]

"[The prosecutor]: My intention was not to – I mean, I think that by saying that it wasn't as if [defense counsel] was committing any type of misconduct. That was not the statement.

"The court: But that's the exact suggestion.

"[The prosecutor]: I . . . disagree with the court. I would never accuse [defense counsel] of misconduct in that way. My point was that he, the defendant, has been able to listen to the testimony. He has been able to cater the testimony to fit to the law." The court took defense counsel's mistrial request under submission, said it was tentatively finding prosecutorial misconduct, but that it wanted briefing on the issue. When closing argument resumed, the trial court immediately admonished the jury by saying: "The last statement, ladies and gentlemen, any comments in regards to the defendant being coached, those are stricken. You are not to consider that statement for any purpose. Disregard it and treat it as though you have never heard that statement."

Following briefing on the issue, the trial court told the attorneys: "I have nothing before me that suggests that the comments were intentional in the sense that they were specifically designed to impugn the character of the defense counsel. I think it was a poor choice of words." The court also said, "My impression is that it was an off-the-cuff remark following up on her discussion as to the credibility of Mr. Castro. But I don't have anything before me to suggest that this was an intentional comment to undermine the defense presentation of the case. I think it was a poor choice of words."

Although finding no prosecutorial misconduct in this case, the trial court consented to defense counsel's request to read a limiting instruction to the jury. The court read the jury the following instruction:

"Ladies and gentlemen of the jury, the prosecutor has made certain uncalled for insinuations about the defendant having been coached. I want you to know that the

prosecutor has absolutely no evidence to present to you to back up that insinuation. Therefore, you must disregard this improper, unsupported remark.

"You are the sole judges of the credibility of the witnesses.

"Your decisions and finding must be based only upon the evidence presented during this trial. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.

"Nothing that the attorneys say is evidence. In their closing arguments they discussed the case but their remarks are not evidence even if they suggested it as such."

### b. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

"To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970 (*Frye*).) "When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 689.)

20

"Although counsel have broad discretion in discussing the legal and factual merits of a case [citation], it is improper to . . . resort to personal attacks on the integrity of opposing counsel [citation]." (*People v. Bell* (1989) 49 Cal.3d 502, 538.) "If there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury, misconduct would be established." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302.) " '[A] "prosecutor is [also] prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record." [Citation.]' " (*People v. Redd* (2010) 48 Cal.4th 691, 740.)

To establish prejudice under California law, Castro must show a reasonable probability that he would have received a more favorable outcome had the prosecution not engaged in the alleged misconduct. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071; *Watson*, *supra*, 46 Cal.2d at p. 837 [the test for prejudice is based on "reasonable probabilities" rather than "mere possibilities"].) To the extent that there is ambiguity in the prosecutor's statement, courts do not "lightly infer" that the jury interpreted the remarks in a way that was most harmful rather than least harmful to the defendant. (*People v. Thomas* (1992) 2 Cal.4th 489, 530; *People v. Howard* (1992) 1 Cal. 4th 1132, 1192.) Castro has the burden of showing that the jury construed the prosecutor's remarks in an improper or erroneous manner. (*Frye*, *supra*, 18 Cal.4th at p. 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

c. *Discussion.*

We do not agree with Castro's contention that the prosecutor committed incurable misconduct by suggesting to the jury that he had been coached on his testimony. Although we agree that the prosecutor's comment could have been interpreted to imply that defense counsel had sought to help deceive the jury, we nonetheless hold that, given the trial court's immediate jury admonition and subsequent jury instruction, the isolated and fleeting nature of the comment (see e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 206-208 [prosecutor's brief reference to biblical judgment day, if misconduct, was de minimus and did not prejudice defendant]), and the improbability that the verdicts

21

would have been any different had the remark not been made, no reversible misconduct occurred.

Castro has not cited any case in which the only alleged prosecutorial misconduct was a suggestion that defense counsel had coached a witness. We are aware of two cases, *People v. Bain* (1971) 5 Cal.3d 839 and *People v. Herring* (1993) 20 Cal.App.4th 1066, which involved accusations of witness coaching among other improper conduct and resulted in reversals, but the overall mischief in those cases was far worse than what happened here. As we explained in *People v. Spector* (2011) 194 Cal.App.4th 1335, 1405-1406:

"In *People v. Bain* (1971) 5 Cal.3d 839, the prosecutor implied defense counsel had coached the defendant to lie. During closing argument, the prosecutor said: ' "You might say to yourself, 'The defendant's got a good story.' Did you think he was going to come in here without a good story? He's had how long to prepare . . . . I don't want to imply that my colleague here, that he told him what to say, but he has the assistance of a lawyer." ' [Citation.] *Bain* held this constituted misconduct: 'The unsupported implication by the prosecutor that defense counsel fabricated a defense constitutes misconduct.' [Citation.]

"In *People v. Herring* (1993) 20 Cal.App.4th 1066, the prosecutor implied defense counsel had suborned perjury by instructing the defendant to invent a consent defense to a rape charge. 'The prosecutor's comments, i.e., "[m]y people are victims. His people are rapists, murderers, robbers, child molesters. He has to tell them what to say. He has to help them plan a defense. He does not want you to hear the truth," were clearly improper and misconduct. His argument inferred that all those accused of crimes whom defense counsel represented are necessarily guilty of heinous crimes. Additionally, he impliedly denigrated the presumption of innocence and the requirement that guilt be proved beyond a reasonable doubt. More egregious, he inferred that defense counsel suborned perjury. It is improper for the prosecutor to imply that defense counsel has fabricated evidence or to otherwise malign defense counsel's character. [Citations.]'
. . . .

22

"But as *People v. Gionis* (1995) 9 Cal.4th 1196, explained: '[B]oth of those cases reflected extreme instances of prosecutorial misconduct. In [*Herring*] . . . the [prosecutor's] argument [in effect] accused defense counsel of suborning perjury and implied that defense counsel did not believe his own client. It also implied that all those accused of crimes whom defense counsel represented were necessarily guilty of heinous crimes. [Citation.] Similarly, in [*Bain*] the prosecutor not only asserted that defendant and his counsel had fabricated a defense, but he also attacked the integrity of counsel and the office of the public defender. Additionally, the prosecutor referred repeatedly to racial matters, stating at one point that he, as a Black man, would not be prosecuting a Black defendant unless he personally believed the man to be guilty. [Citation.]' [Citation]; see also *People v. Breaux* (1991) 1 Cal.4th 281, 305 ['*Bain* was an extreme case of prosecutorial misconduct'].)"

The isolated, fleeting remark in the case at bar came nowhere close to the kind of attack on defense counsel that occurred in *Herring* and *Bain*, and the trial court's immediate admonition and subsequent instruction to the jury cured any possible prejudice from the prosecutor's comment. Moreover, it is not reasonably probable that in either incident (the theft of the gun or its subsequent use to threaten Patricia) would Castro have obtained a more favorable outcome if the remark had not been made. As we have already said, it is clear the jury did not believe the story told by Castro and Patricia that he never threatened her with the gun. It is also clear that, given the fact Revilla called police to report the theft of Brown's gun, it was highly unlikely the jury would believe Castro's story that he was really just borrowing the gun and he intended to return it as soon as he could get Revilla to come pick it up from him.[10]

We conclude Castro has failed to demonstrate reversible prosecutorial misconduct.

---

[10]     Castro asks us to review the prosecutorial misconduct claim with an eye toward its possible cumulative effect on the trial when considered along with the other errors he has alleged. However, the only error we have found was the failure to instruct on the lesser included offense of attempted criminal threat, and that single error was harmless.

23

5. *Review of in camera* Pitchess *hearing.*

Castro requests review of the trial court's ruling on his motion seeking discovery under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 of the personnel files of Deputies Woullard and Veliz.  (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1232.)  Review of the in camera hearing by this court reveals no abuse of discretion.  The trial court conducted the hearing properly, describing the nature of all the complaints against the officers, which were not discoverable under *Pitchess* standards.  There was no error.

## DISPOSITION

The judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



ALDRICH, J.



LAVIN, J.



24